IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN ZINKEL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.   17 C 7281 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| VICKY PIPER, an individual, PRADIPTA | ) | |
| KOMANDURI, an individual, CAROLYN | ) | |
| NELSON, an individual, and LOYOLA | ) | |
| UNIVERISTY HEALTH SYSTEM, an Illinois | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Zinkel has brought a six count revised second amended complaint against

defendants Vicky Piper, Pradipta Komanduri, Carolyn Nelson, and his and their employer,

Loyola University Health System ("Loyola"), alleging intentional infliction of emotional distress

("IIED") against Piper, Komanduri, and Nelson (Count I); IIED against Loyola (Count II);

tortious interference with a business relationship or expectancy against Piper, Komanduri, and

Nelson (Count III); and discrimination in violation of Title VII of the Civil Rights Act, 1964, the

Age Discrimination and Employment Act ("ADEA") and the Americans with Disabilities Act

("ADA") against Loyola (Counts IV through VI).   Early on the parties began settlement

negotiations and thought they had reached an agreement.   Unable to agree on the release

language, the settlement broke down.   After the court denied plaintiff's motion to enforce what

he thought was a binding agreement, defendants moved to dismiss Counts I through III of the

revised second amended complaint.  For the reasons described below, that motion (Doc. 48) is denied.

## **BACKGROUND**

Plaintiff worked for Loyola for 33 years before his employment was terminated on February 20, 2015.  His last position was Director of Respiratory Care.  During the period in question Piper was Loyola's Human Resources Vice-President.  Nelson was Director of Human Resources, and Komanduri was a Vice President.

Plaintiff was diagnosed with lymphocytic leukemia in December 2011.  At that time his condition was monitored but he did not undergo any treatment.  By June 2013 his condition had worsened, and he was hospitalized at Loyola.  Piper and Nelson were aware of plaintiff's condition from that point forward, both having approved his leave under the Family and Medical Leave Act ("FMLA").

After his FMLA leave ended, plaintiff returned to work in September 2013.  He completed a six month round of chemotherapy in December 2013.  On September 30, 2014, he met with Komanduri, Nelson, Piper, and Loyola's Chief Executive Officer ("CEO") Wendy Leutgens.  Leutgens told plaintiff to prepare a plan to reduce the number of full time equivalent employees ("FTEs") on his staff by seven, a cut of greater than 8% of the full time staff.  Piper told him that they settled on seven after consulting "Decision Support," the hospital unit charged with determining staffing levels.  Not happy, plaintiff himself met with Decision Support and was told that seven was too many, and that the appropriate number of cuts was four.

Plaintiff told Komanduri of his discussion with Decision Support and she confirmed that plaintiff should reduce his department by four FTEs.  Plaintiff began submitting plans for the

reductions, each of which was rejected and met with ridicule from Leutgens.   On October 24, 2014, Komanduri and plaintiff communicated by email about his latest plan.   Plaintiff thought the plan might be accepted.   Komanduri closed her final email by telling plaintiff to have a good weekend.   Eighteen minutes later plaintiff was called into Komanduri's office where Komanduri and Nelson waited.   Plaintiff was issued a work improvement plan ("WIP").   According to plaintiff the WIP contained false statements about his performance.   Nelson yelled and screamed at plaintiff, stating that he was wasting everyone's time with his proposed plans.   Nelson threatened plaintiff that he would lose his job, benefits, and whole career if he did not develop an acceptable reorganization plan.

At the October 24 meeting, plaintiff told defendants that he had been an employee for 33 years, always had positive reviews, that he had leukemia and needed his job and benefits.   Plaintiff began to cry, but got no response from defendants.   Three days later, plaintiff collapsed in his office.   He collapsed again at the Cancer Center.   His condition had worsened, and he needed triple chemotherapy for six months.   Plaintiff subsequently went on three months FMLA leave.   He returned to work early, after only two months.

In early January 2015 he met with Komanduri and Nelson to review his most recent reorganization plan.   Nelson again screamed that he was wasting her time and that he was going to lose his job, benefits, and career.   Komanduri claimed the plan made no sense even though it was the same plan that was ultimately submitted by one of plaintiff's subordinates and approved after plaintiff had stopped working.

On February 20, 2015, plaintiff was called into a meeting with the HR Department.   His WIP had not yet been completed.   He was given a "Confidential Separation Agreement and

Release."   He told Komanduri and Nelson that he was still receiving chemotherapy and that their actions might violate the ADA.   Komanduri and Nelson left the room for 30 minutes and upon their return told plaintiff that he could extend his short-term disability leave for another three months, and that after he returned they could either finalize the Separation Agreement or he could start a long-term disability claim.   In either event, he would be terminated when his leave ended.

## **<u>DISCUSSION</u>**

Defendants have moved to dismiss Counts I through III, arguing that the claims are preempted by the Illinois Human Rights Act, 775 ILCS 5/8-111, which provides:

> Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act.

The IHRA outlaws employment discrimination based on sex or disability.   Employment discrimination is described as "incidents in which an employer acts with respect to promotion, renewal of employment . . . discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status."   <u>Naeem v. McKesson Drug Co.</u>, 444 F.3d 593, 602 (7th Cir. 2006) (<u>quoting</u> 775 ILCS 5/1-103(1), (5-2-102(A)). Whether a claim is preempted by the IHRA depends on the source of the duty allegedly breached.   The Act does not preclude a court from exercising jurisdiction over all tort claims related to civil rights violations, only those claims that are inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the IHRA itself.   <u>Id</u>. (<u>citing</u> <u>Maksimovic v. Tsogalis</u>, 177 Ill.2d 511, 516-17 (1997).

Under this Rule, it is apparent that "claims of intentional infliction of emotional distress are not categorically preempted by the IHRA." Naeem, at 603. If a plaintiff can allege facts sufficient to establish the elements of the tort, then that tort is not preempted by the IHRA. Id. "[T]he elements of IIED are quite different from those necessary to establish a civil rights violation under the IHRA." Id. Thus, whether plaintiff's IIED claims are preempted depends on whether the facts alleged support a claim for IIED independent of the legal duties furnished by the IHRA. Id. at 604. In this regard, it does not matter if the facts alleged also support plaintiff's discrimination claims as alleged in Counts IV through VI of the revised second amended complaint. Id.

Under Illinois law, a claim for IIED requires plaintiff to plead and prove that: (1) defendants' conduct was extreme and outrageous; (2) defendants intended to inflict severe emotional distress or knew that there was at least a high probability that their conduct would inflict severe emotional distress; and (3) defendants' conduct did cause severe emotional distress. Id. at 605.

Defendants argue that the actions alleged do not support a claim unless those actions were motivated by discriminatory animus based on defendant's race, age, or disability, as alleged in Counts IV through VI. They argue that plaintiff has no independent right to not be placed on a WIP, to be free from criticisms of his work product, to be free from statements that his job was in jeopardy, or to be free from personal directives with which he strongly disagreed.

"[T]o qualify as outrageous, the nature of the defendants' conduct must be so severe as to go beyond all possible bounds of decency an be regarded as intolerable in a civilized society." Richards v. U.S. Steel, 869 F.3d 557, 566 (7th Cir. 2017). "Mere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities do not amount to extreme and outrageous conduct." Id. IIED is even more constrained in the employment context. Id. "Illinois courts have limited recovery to cases in which the employer's conduct has been truly egregious." Id. (quoting Van Stan v. Fancy Colours & Co., 125 F.3d 563, 568 (7th Cir. 1997). That is because "if every day job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for [IIED], nearly every employee would have a cause of action." Graham v. Commonwealth Edison Co., 318 Ill.App.3d 736, 746 (1st Dist. 2000). Nevertheless, "Illinois courts have found extreme and outrageous behavior to exist in the employer, employee context when the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." Id.

In the instant case, although many of plaintiff's complaints constitute typical workplace stress, the allegation that defendants continually threatened the loss of benefits knowing that plaintiff had leukemia and needed constant health care, and was thus "particularly susceptible to emotional distress," is sufficiently extreme to support an IIED claim outside the duties imposed by the IHRA. See Naeem, 444 F.3d at 606. Consequently, the court denies defendants' motion to dismiss Counts I and II based on IHRA preemption.

Defendants also argue that the IHRA preempts plaintiff's tortious interference with a business relationship or expectancy claim. To establish a claim for tortious interference, plaintiff must allege: (1) the reasonable expectation of a valid business relationship or continued employment; (2) that the individual defendants knew of the expectancy; (3) that the individual defendants purposely prevented the expectancy from ripening; and (4) damage.

Fellhauer v. City of Geneva, 142 Ill.2d 495, 511 (1991).   A reasonable expectation of continued

employment can be the basis for a tortious interference in business relationship claim.   Redd v.

Nolan, 663 F.3d 287, 291 (7th Cir. 2011).

Because the individual defendants were plaintiff's managers, they are protected by a

qualified privilege.   Bowers v. Radiological Society of North America, Inc., 57 F.Supp.2d 594,

600 (N.D. Ill. 1999).   Thus, as part of his prima facie case, plaintiff must show that the

defendants' actions were unjustified or malicious.   Id.   Malicious, in a context of tortious

interference cases, means that the interference must have been intentional and unjustified.   Id.

The revised second amended complaint alleges that the individual defendants' actions

were motivated, at least in part, by their desire to cover up the fact that their proposed plans to

terminate seven FTEs was unsafe and that they had been dishonest when stating that Decision

Support had recommended seven cuts.   Although these allegations appear thin, they are

sufficient to support an intentional interference claim and are not in any way dependent on the

legal duties established under the IHRA.   Consequently, the court denies defendants' motion to

dismiss Count III based on IHRA preemption.

Finally, defendants argue that plaintiff's IIED claims are barred by the exclusivity

provision of the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/5(a) which

provides:

> No common law or statutory right to recover damages from the employer . . . or
> the agents or employees of . . . [the employer] for injury or death sustained by any
> employee while engaged in the line of his duty as such employee, other than by
> the compensation herein provided, is available to any employee who is covered
> by the provisions of this Act.

An injury intentionally inflicted by a co-employee may still be accidental within the meaning of the IWCA if the employer did not direct, encourage, or expressly authorize the co-employee's conduct.   Meerbrey v. Marshall Field and Co., Inc., 139 Ill.2d 455, 463 (1990). Such injuries are unexpected and unforeseeable from both the injured employee's point of view, and are accidental from the employer's point of view at least where the employer did not direct or expressly authorize the co-employee's actions.   Id. at 464.

The exclusivity provision does not bar a common law claim against an employer for injuries that the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer.   Id.   In the instant case, plaintiff alleges that the individual defendants had authority to discipline him and to terminate his employment. He thus alleges that together they had final decision making authority or, at least, were authorized to terminate his employment, which they did.   These allegations are sufficient to allege that the individual defendants were the alter egos of Loyola.   In any event, the count is brought only against defendants Piper, Komanduri, and Nelson in their individual capacities. Consequently, the court denies defendants' motion to dismiss Counts I and II based on IWCA preemption.

## **CONCLUSION**

For the reasons described above, defendants' motion to dismiss Counts I, II and III of the revised second amended complaint (Doc. 48) is denied.   Defendants are directed to answer these counts on or before June 26, 2019.   The parties are directed to submit a joint status report

using the court's form on or before June 28, 2019. This matter remains set for a report on status July 11, 2019.

**ENTER:**      **June 5, 2019**

**Robert W. Gettleman**
**United States District Judge**